Good afternoon, Your Honor and Ms. Corlette. My name is Tom Higgins. I represent the appellant. I'm from Tucson. I'd like to use my time to break down my arguments along both of the ones in the brief, although they're actually more similar than at first glance would appear. We all know it's fine for the cops to lie. They arrest A and B. They take them into the station. They separate them. They go into A. Tell me about the shooting. Tells them, I want an attorney. Go away. They go into B and say, A just said, you're the trigger man. You're the one that did that. Case law is uniform. That's fine. They can do that. They can trick people and all. But it seems to me that there should be a little brighter line when they're talking about the trial fact rather than a defendant to get a confession. The strange thing about this case is they didn't need to do all this. Judge Jorgensen, after the hearing on the motion to dismiss, after the evidentiary hearing concerning the CPS records, made the comment along those lines that this was a very complicated case. They were very, very busy. It was not a complicated case. It's your white bread, run-of-the-mill, hand-to-hand drug sale. But in the first argument and the first evidentiary hearing was on a Miranda violation for making threats to have the children taken away by CPS. At that evidentiary hearing, all five agents testified that no one called CPS, no one threatened her. Judge Jorgensen made a finding based on, quote, the credibility of the officers and the uniformity of their statements, and went ahead and denied that motion to suppress. The next thing that came up was between then and the change of plea and sentencing, Mr. West, the defense attorney in the CPS records, said, in fact, showed that they were called not only by an agent but by the FBI agent, Mr. Greg Roos, that those calls are in a very strange time period. The government, in its answering brief, maintains that the Roos showed up at 5 o'clock, which is after when the children were already gone, to the relative. But the phone records later at the evidentiary hearing on the motion to dismiss show that he had made two calls prior to 5 and then another one late, actually three hours later. When that was brought up, his response was, I don't remember that. Of course, what could he say? He didn't remember it when it happened, but he got caught because of some, I think, excellent work by the defense attorney. What has to be looked at in tandem with this is Judge Jorgensen herself was bothered by that. Although she said and essentially made excuses for the agents during that, she also talked about the delay of time. But she said she had wished this had all been brought up earlier. And it couldn't have been. It wasn't discovered until then. The case law I've cited in my opening and reply brief talk about the government not just producing false evidence, but letting incorrect evidence come out without correcting it. So we were in the position of what's Roos going to say now that he'd been caught with dealing with CPS? And he said I can't remember. Anyway, be that as it may, the government has, as mentioned in their reply or in their answering brief, we didn't use the confession anyway. So there, that can't be the end of the analysis. If Ms. Singletary, instead of being threatened with their children being removed and prisoned, were tortured, physical, horrible torture, neither this Court nor any district court would allow the government to come in here and say, oh, my bad, I'm not going to use the confession, no harm, no foul. That means it's a matter of degree. It is not a remedy that the government decides they're not going to use it. This was compounded by the actions of Mr. Giles, the government prosecutor, when he not only said we're not going to use it, he did a motion to preclude the defense from bringing that up. The only explanation for that is he did not want the jury to feel sorry for Ms. He didn't know she was going to testify at that time, for Ms. Singletary, and the judge granted that. And then he turned around in the closing argument and in the case in chief, bringing up over and over again the children being there. Now, Judge Jorgensen ruled during the trial that the statements about the children being there were co-conspirator statements in furtherance of the conspiracy. That's pretty off the wall, even by my standards as a defense attorney. I'm having problems with that. But anyway, it was encouraged, and you can tell by the record, Mr. Giles getting to the point where at the end rebuttal, he is hitting it again about the kids, naming the kids, that they're coming in there, that they get in the way of meth deals, that all that again after that happened. A very recent case that I cited in the reply brief of Novari, I believe it is, or Novari, Novari, talked about the case where the prosecutor was held to be in a proper closing argument talking about the little boy at McDonald's, that if a drug rip would have gone down, and who knows what would have happened to him. Our case is much more egregious than that. Let me maybe talk to you about the motion to dismiss the indictment. We're really talking about outrageous conduct there, aren't we? That is the... And it's got to be so shocking to due process that the indictment must be dismissed? That is the analysis. What's your best case to suggest that this is outrageous conduct? Well... I mean, I went through quite a few cases. U.S. v. McQuinn, U.S. v. Brary, U.S. v. Gonzalez Benitez, Gonzalez, Smith, Emmert, Simpson, Williams, went through a lot of cases to come up with this outrageous conduct. There's some pretty outrageous conduct that's allowed. So I'm trying to figure out what's your best case. I agree. I've always kind of had a, when these things come up, a problem with using the word outrageous. I used an outrageous example when I was talking about the torture of Ms. Singletary and then the government not deciding not to use the confession. But I think what's happening, and I don't know about Your Honor, but there are steps, and I think actually the closing argument by Mr. Giles about the children there is far more outrageous than the hiding the ball that the agents did in the beginning. So you really think your second issue is better than your first? I do. About the district court permitting the jury to hear the evidence? I do, Judge. And it's almost like a cascading effect, because once that was during the trial, that it came up about it's all right to talk about the children as co-conspirator exceptions, it then went on and got aggravated. And you can see that clearly when you read the transcripts, particularly in the rebuttal portion of closing argument. But you're right. A lot of these things are outrageous and worthy of the word. I guess I'm trying to figure out, even in your second argument,  You do. My first standard review would be if you didn't make an objection, which the government argued it would be plain error review, but if you did make an objection, then at that point I'm looking at abuse of discretion. That's absolutely correct. And even with an abuse of discretion, I'm looking at harmless error after that. Do you agree with that? I would, Judge. I think that's an accurate statement by yourself and by the prosecutor. If I read the transcript and if I read what happened at trial, are you suggesting that there is not enough evidence to convict? No. Even given this statement by the prosecutor? Because that's really the harmless error analysis, isn't it? I would, Judge, except for the fact that outrageous government conduct, although the analysis follows that lines, there also is almost like a Fourth Amendment type of check on the police and the prosecutors by doing that. I follow your analysis about it. And like I said when I started my argument, Judge, you're correct, this was a white bread, it was not complicated, and it was hand-to-hand sales with an undercover agent. You're right. So if you do harmless error and pull that out, I'm saying you should not do that. Because you have a duty to oversee the conduct of the government prosecutors and the agents, and that was out of line. And that's where you have to come in and do that. Just like for a long time with Fourth Amendment analysis, they used to try and get Leon and that type of way to get around it. But the fact is it's discouraged misconduct of that type. Thank you, counsel. Thank you. Thank you. May it please the Court, Celeste Corlett here on behalf of the United States. The district court did not err when it denied the defendant's motion to dismiss, and this court does not even have to reach the factual analysis in that case or on the motion to dismiss. Because as we've already discussed, the government did not even introduce the defendant's statements, and so there was no prejudice by the agent's oversight because that concerned the admissibility of the defendant's statements. And even the defendant agrees that he has to show substantial prejudice to be able to support his claim. Now, defendant claims now, after the trial, that he was prejudiced because a statement was not admitted. However, that was not his strategy at trial. His strategy at trial, if you look at ER-58, was that he concurred with the government to not admit the defendant's statements at trial. ER-58, he says he concurs not admitting the defendant's statements, and he says that's because the benefits outweigh having her statements introduced. Why is that? Because her statements were inculpatory. She admitted distributing methamphetamine. So his strategy at trial was that his defense was that the government could not identify her as the one who actually delivered the drugs because the government never saw her, except the last instance, actually hand over drugs. On the other occasions, she would go to the back bedroom, then mysteriously the drugs would come out with another person. So that was his strategy at the time, don't admit the statements. That's what he tried to do initially in the motion to suppress, to suppress her statements where she admits guilt. Then after the motion to suppress before trial, he agrees he does not want to have her statements admitted, and that was his strategy. And, again, it's because they were inculpatory. And now he can't complain that his strategy didn't fail and he was prejudiced because he wants the statements admitted now after the trial's over and after he concurred not to admit those statements. So the statements were not even admitted. There was no prejudice. As to the second issue, the district court also did not commit plain error or abuse of discretion when it allowed in the co-conspirator statements. The first thing I'd like to point out is that these co-conspirator statements were all undercover tapes that the undercover agent had recorded during these drug transactions. And at ER 70 to 73, defense counsel does not object to the admission of all of these tapes with all of these statements, including all of the statements of the co-conspirator where she identifies the defendant by the children that she's bringing with her or there's some association with the child. So that's why we argue that it's plain error because all of the tapes with all of the co-conspirator statements, the defendant specifically said he had no objection to the admission of those tapes. And that's what we also offered as it was Exhibit 4 was a transcript of those tapes that we put in our SCR. The first time that he does object, this is again well after he says he doesn't object to all of the defense counsel, says he doesn't object to all of those tapes coming in. The first time he objects is when the undercover agent is describing what happened on these tapes. So they're playing the tapes, but then he tries to describe also what's happening, some of the sounds and the background issues that are going on. And at that time, even then, defense counsel does not object based on prosecutorial misconduct. First he objects saying it's hearsay. Then he says it's not corroborated. Then he says it's not relevant. And finally he ends up on it's prejudicial. But the district court was correct in ruling that it was relevant because it completed the story and it was relevant because it identified the defendant. Remember, this is the defendant's whole defense that we cannot identify her as the person who handed over the drugs. So they keep, during all of the drug transactions, her co-conspirators are referring to her as she will bring the drugs or she's going to do this. They purposely are not saying her name. And so the undercover agent has to try to figure out who it is that is bringing the drugs. So he says she's coming along with her child Alex or she has to pick up this child at school before she gets there. So the undercover agent describes to the jury that when she arrives, the co-conspirator said there she is, again not using her name, and Alex is with her. And so that's why they're bringing out the child, because they're trying to identify her. No, so far so good. But then you get to the closing argument where really the closing argument emphasizes the danger to kids. So certainly there's an argument to be made that it's relevant to show time, place and identity, but then it gets used for a different purpose in closing argument, which is look at how heartless and terrible this person is. She is involving her kids in a drug transaction. Whereas if that had been the purpose and stated to the district judge, I doubt the district judge would have allowed it under 403. There are two points in closing. There was closing when there was a child mentioned, and in rebuttal there was a child mentioned. In the closing section, the government is reading from the transcript, and we describe that in our answering 47 to 48. He's just reading the transcript. But, counsel, my worry is I read the transcript too, and it seems to me the prosecutor was using these comments to prejudice the defendant because she was dealing drugs with kids around, regardless of where he was reading it from, regardless of what he was doing, the bottom line of what the prosecutor was doing, saying the defendant was dealing drugs with kids around. I want you to know that, ladies and gentlemen of the jury. I want you to focus on that, and, therefore, that's what the conduct we're looking at now, not where he read it from or what he got to, but why was the prosecutor even into that, given the problems that come from that kind of an approach? Your Honor, the first of all, I just ---- It's an improper argument. Wouldn't you have to agree? I'm sorry, what? It's an improper argument to say, look, I'm going to ---- you should convict this defendant because she sold drugs around kids. If that's what the government said, I would agree that was an improper argument. Yeah. That's not what the government said. What the government said ---- Well, it tells the jury to take the charges seriously because three of the sales were taking place around a swarm of children. One case, she brings her 12- to 13-year-old daughter. Another case, she brings three kids. The last one, she brings her son. So this is in the rebuttal argument, and this is important because what happened before the rebuttal argument was the defendant's close, and in the defendant's close, what he is saying is that ---- I'm trying to find where it was. Oh, he says that you have to assume that she must have brought the drugs. This is at SCR 128 and 129. Then the defendant says they never received anything from her directly. And so we have these assumptions. So the government specifically says this is what the defendant said in his closing, this is how we're rebutting that. We do ---- you don't have to assume. Listen to the tapes. And he even says ---- Swarm of kids. Swarm of kids. That doesn't have any ---- Your Honor, I would say that that may have been an inarticulable expression of what he's trying to say, but ---- Well, or, quote, kids get in the way of dealing meth, it turns out. Ladies and gentlemen, she picks up her kids on the way to a meth deal. I mean, it's pretty clear what's happening to me. It's trying to prejudice the jury, inflame the jury, that there are kids involved here, that this is pretty serious. I disagree, Your Honor. That's not ---- I disagree that's what the government was trying to say. And specifically, he even said ---- Kids get in the way of dealing meth. What does that have to do with anything? Because that was the whole point, that he's saying this is how we know it's her because before they were waiting for her to deliver the drugs. Before she could deliver the drugs, she has to go pick up her son at a basketball practice, and then she's going to come. So he's making a remark that the child gets in the way of her bringing the drugs directly because she has to pick up the kid first and then bring the drugs. But he even specifically said that the government said this is not ---- he tells the jury this is not for prejudice. This is to show ---- I know. That's like, you know, praising Caesar. I mean, it's ---- Well, Your Honor, I ---- Don't be ---- this is not to tell you you shouldn't be prejudiced by what I'm about to say. I mean, that's classic, isn't it? Well, Your Honor, I would say that even if he was not as articulable as he could have been in that one tiny phrase in the whole trial, the Supreme Court indomitably said that the meaning that is less than crystal clear, the Court should not infer the most damaging meaning. And I would ask the Court to do that here, that not to infer the most damaging meaning to that phrase, especially when ---- Well, sometimes the phrase is ---- I mean, it's not to quarrel with you, but it's two or three or four times as ---- It's hard to read the closing without drawing the implication that the prosecutor is really underscoring that the kids are there. And you know that. I mean, it is prejudicial. Of course it is. And Your Honor ---- You know, counsel? Counsel? Yes, Your Honor. I would feel much more comfortable about the government's argument if it was arguing harmless error rather than that this is proper closing argument. Don't put the government in the position of talking that way. I mean, it's ---- it is something that I find quite distasteful and that the government should not tolerate that kind of thing. And you should say, we're sorry we did that, but in this case it was still harmless. Thank you, Your Honor. My time is up. May I respond? Sure. I am sorry that he was not articulate in what he was expressing. But I do ---- He was terribly articulate, counsel. He was terribly articulate. But I do also, and we did also agree, that it is harmless, that ---- and we discussed this in our answering brief at pages 54 to 55, that there were jury instructions that were provided specifically that they should not be influenced by prejudice. The defense counsel never objected to the jury instructions, never asked for additional jury instructions. And the evidence was overwhelming. And I won't repeat that, but it is on ---- in our answering brief at 54 to 55. We don't believe that there was an abuse of discretion or plain error. And if this Court were to find that somehow that was not proper in what he said, we still would argue that it was harmless based on the overwhelming evidence in this case as we described in our answering brief. Thank you, counsel. Thank you, Your Honor. You've used up your time, but we'll give you about 30 seconds. No. Your Honor, I noticed the clock. I was just about at the end of my 10 minutes. I don't have anything to add unless there would be some questions. No. Thank you. Thank you both for your arguments. The case just will be submitted, and we'll take a 10-minute break before argument in the next case. All rise. This Court stands at recess for 10 minutes. Your recess. You don't have to wait for me, Alex. Thank you. Recess. Resolution. 12R. Thank you. All rise. This court now resumes the session. Seated. I know it's tough out there to be the end of a long calendar. We've been there before and we understand what you're going through. We do have some more cases on the calendar, but we appreciate your patience. It's easier for us to sit through it because we're asking the questions, but it's not your case. I know it's hard. With that, our next case on the oral argument calendar is and I may be mispronouncing this. Doobie Doobie versus Densha.
judges: Fletcher B. , Thomas, Smith R.